UNITES STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| HDI GLOBAL INS. CO., | : | Hon. Joseph H. Rodriguez |
| Plaintiff, | : | Civil Action No. 14-3614 |
| v. | : | OPINION |
| WORTH & COMPANY, INC., | : | |
| Defendant/Third Party Plaintiff, | : | |
| v. | : | |
| UNIVEG LOGISTICS AMERICA, INC., | : | |
| Third Party Defendant. | : | |

This matter is before the Court on three motions for summary judgment. The Court heard oral argument on the motions on March 7, 2017 and the record of that proceeding is incorporated here. For the reasons placed on the record that day, as well as those articulated below, the motions will be granted.

Background

This subrogation action arises from a March 26, 2013 fire at a refrigerated warehouse and fruit packing facility (the "Facility") in Swedesboro, New Jersey leased and operated for cold storage and repack operations by Third Party Univeg Logistics America, Inc. Plaintiff HDI Global Insurance Company insured Univeg by Commercial Property Policy 12109-01 in effect December 31, 2012 to December 13, 2013. Pursuant to that insurance policy, HDI paid Univeg $3,696,438 for property damage to the warehouse, equipment, and its produce

1

caused by the fire. Under the terms of the insurance policy (and payment by HDI to Univeg), HDI is subrogated to Univeg's rights and here sues Defendant Worth & Company, Inc. in a diversity action for breach of contract and negligence.

In a related case consolidated with the HDI matter, Plaintiff Sader-Diers & Von Eitzdorf SA\VE Assecuranczbureau OHG ("SAVE") asserts a negligence claim against Worth as subrogee to the rights of its insured, Seald Sweet LLC d/b/a Seald Sweet International. Seald Sweet is one of Univeg's customers; it delivers produce to the Facility where, for a fee, Univeg warehouses the produce and prepares it for delivery to its final destination such as a grocery store. SAVE paid Seald Sweet a settlement of $875,000 under its Marine Cargo Policy No. 0300 for the loss of fresh fruit being stored at the Facility as a result of the fire.

Univeg and Worth had entered into an HVAC Maintenance Agreement effective June 1, 2012 to May 31, 2013. According to the pleadings, the temperature in Univeg's facility was maintained through the use of HVAC systems, including compressors installed on the roof of the warehouse. On the morning of March 26, 2013, Univeg employees noted that the temperature in one of the refrigerated rooms in the warehouse was too warm. The employees contacted Worth and requested service. The responding Worth technician allegedly determined that the cause of the elevated temperature was that two roof-mounted freezer compressors were shut off. Plaintiffs assert that when the Worth technician

reset a circuit breaker, the breaker panel began arcing and erupted into flames, resulting in the fire at the Facility. They contend that the fire was due to Worth's negligent failure to properly inspect, maintain, and service the compressors and connected electrical panels in breach of the HVAC Maintenance Agreement.

Worth has filed several Third-Party Complaints,[1] three of which are at issue in summary judgment motions presently before the Court. Worth claims that Third-Party Defendant The Flynn Company, which was the property manager of the warehouse, was contributorily negligent in causing the fire and/or is responsible for indemnification because it failed to inspect, maintain, and monitor the Facility's indoor electrical panels (which allegedly were improperly maintained, causing the fire). As against Third-Party Defendant Columbia New Jersey Commodore Industrial, LLC ("Columbia"), former owner/landlord of the Facility, Worth asserts claims for negligence and indemnification for failure to ensure that the electrical framework and its component parts, including the circuit breaker at issue, were properly designed, installed, safe for use, and in compliance with applicable laws and regulations. Similarly, Worth has sued the owner/landlord of the Facility at the time of the fire, Cabot III-NJ2M01-M02, LLC ("Cabot") for negligence and indemnification.

---

[1] In the Order consolidating the cases, Worth was deemed to have asserted the same third-party claims against the third-party defendants as to SAVE's claim as Worth asserted against the third-party defendants as to HDI's claims.

Summary Judgment Standard

"Summary judgment is proper if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law." Pearson v. Component Tech. Corp., 247 F.3d 471, 482 n.1 (3d Cir. 2001) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)); accord Fed. R. Civ. P. 56 (a). Thus, the Court will enter summary judgment in favor of a movant who shows that it is entitled to judgment as a matter of law, and supports the showing that there is no genuine dispute as to any material fact by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56 (c)(1)(A).

An issue is "genuine" if supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit. Id. In determining whether a genuine issue of material fact exists, the court must view the facts and all reasonable inferences drawn from those facts in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. Id.; Maidenbaum v. Bally's Park Place, Inc., 870 F. Supp. 1254, 1258 (D.N.J. 1994). Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party. Andersen, 477 U.S. at 256-57. "A nonmoving party may not 'rest upon mere allegations, general denials or . . . vague statements . . . .'" Trap Rock Indus., Inc. v. Local 825, Int'l Union of Operating Eng'rs, 982 F.2d 884, 890 (3d Cir. 1992) (quoting Quiroga v. Hasbro, Inc., 934 F.2d 497, 500 (3d Cir. 1991)). Indeed,

> the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

Celotex, 477 U.S. at 322. That is, the movant can support the assertion that a fact cannot be genuinely disputed by showing that "an adverse party cannot produce admissible evidence to support the [alleged dispute of] fact." Fed. R. Civ. P. 56(c)(1)(B); accord Fed. R. Civ. P. 56(c)(2).

Case 1:14-cv-03614-JHR-JS   Document 199   Filed 03/20/17   Page 6 of 20 PageID: 5316

In deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). Credibility determinations are the province of the factfinder. Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

## Discussion

To state a cause of action in negligence under New Jersey common law, "a plaintiff must prove four elements: '(1) [a] duty of care, (2) [a] breach of that duty, (3) proximate cause, and (4) actual damages.'" Brunson v. Affinity Federal Credit Union, 972 A.2d 1112, 1122-23 (N.J. 2009) (quoting Polzo v. Count of Essex, 960 A.2d 375, 384 (N.J. 2008)). "The threshold inquiry in a negligence action is whether the defendant owed the plaintiff a duty of care." Holmes v. Kimco Realty Corp., 598 F.3d 115, 118 (3d Cir. 2010). The existence of a duty of care is generally a matter of law. Id. (citing Carvalho v. Toll Bros. & Developers, 675 A.2d 209, 212 (N.J. 1996)).

In New Jersey, "whether a duty is owed to a person injured on the premises and the extent of that duty turns upon a multiplicity of factors, including a consideration of the relationship of the parties, the nature of the attendant risk, defendant's opportunity and ability to exercise reasonable care, and the public

6

interest in the proposed solution." Geringer v. Hartz Mountain Dev. Corp., 908 A.2d 837, 842 (N.J. Super. Ct. App. Div. 2006) (citing Hopkins v. Fox & Lazo Realtors, 625 A.2d 1110 (1993)). In Gehringer, a personal injury case, the New Jersey Appellate Division determined that a landlord that had entered into a "triple net" lease with a commercial tenant owed no duty to maintain or repair the portion of its premises that the applicable lease provisions described as the responsibility of the tenant. Id. at 843; see also Leonard v. Golden Touch Transp. of N.Y., 144 F. Supp. 3d 640, 644 (D.N.J. 2015). The court found an exception to relieving the landlord from liability when the provisions of the lease require the landlord's approval in the design and construction process at fault, and the facts support the landlord's involvement. Id. at 844-45; see also Ahlstrom v. TMC Properties, LLC, 2010 WL 3834505 (N.J. Super. Ct. App. Div. Sept. 30, 2010). However, "a commercial landlord's reservation of a right to re-enter the premises to perform repairs does not suffice as a matter of law to make the landlord liable for the unrepaired condition of the leased premises." Id. at 843 (citing McBride v. Port Auth. Of N.Y. and N.J., 685 A.2d 520 (N.J. Super. Ct. App. Div. 1996)). A triple net lease "is a lease in which a commercial tenant is responsible for 'maintaining the premises and for paying all utilities, taxes and other charges associated with the property.'" Id. at 843 n.2 (quoting N.J. Indus. Properties v. Y.C. & V.L., Inc., 495 A.2d 1320 (N.J. 1985)).

**In this case**, on May 12, 2011, the then-owner of the Facility – Columbia New Jersey Commodore Industrial, LLC ("Columbia") – as landlord, entered into a Standard Industrial Lease Agreement ("Lease") that leased the Facility to De Weide Blik NV, as the tenant. (Haggerty Cert. Ex. B; Kayal Cert. Ex. A; Murphy Cert. Ex. F.) The Lease set forth the landlord's responsibilities for maintenance and repair of the Facility as follows:

> Landlord shall maintain and repair only the roof (which expressly excludes the ceiling of the Premises), and the foundation and the structural soundness of the exterior walls of the Building and utility facilities stubbed to the Premises in good condition, reasonable wear and tear excepted. The term "walls" as used herein shall not include windows, glass or plate glass, doors, special store fronts or office entries, unless otherwise specified by Landlord in writing. Landlord shall maintain, repair and repaint the exterior walls, overhead doors, canopies, entries, handrails, gutters, and other exposed parts of the Building as deemed necessary by Landlord to maintain safety and aesthetic standards. Landlord shall maintain, repair, and operate the common areas of the Project, including but not limited to, mowing grass and general landscaping, maintenance of parking areas, driveways and alleys, parking lot sweeping, paving and restriping, exterior lighting, painting, pest control and window washing.

(Id. § 5.1.)

The tenant's responsibilities for maintenance and repairs of the Facility under the Lease include everything that the landlord is not responsible for:

8

> Tenant shall, at its own cost and expense, keep and maintain all parts of the Premises (except those listed as Landlord's responsibility in Paragraph 5.1 above) in good and sanitary condition, promptly making all necessary repairs and replacements, including but not limited to, windows, glass and plate glass, doors, any special store front or office entry, interior walls and finish work, floors, warehouse slab repairs and floor covering, heating and air conditioning systems (except as otherwise set forth in Section 1.3(a) hereof), dock boards, truck doors, dock bumpers, plumbing work and fixtures, termite and pest extermination, and regular removal of trash and debris.

(Id. § 6.1.) Further,

> Tenant shall, at its own cost and expense, enter into a regularly scheduled preventative maintenance/service contract with a maintenance contractor for servicing all heating and air conditioning equipment and systems (including, without limitation, the Cooling Units after the expiration of the Guaranty Period) within, or exclusively serving, the Premises.

(Id. § 6.2.)

Specific to the HVAC units, Section 1.3(a) of the Lease contains the following language:

> The freezer and cooler units serving the Premises (the "*Cooling Units*") shall be guaranteed for one (1) year from the Commencement Date (the "*Guaranty Period*") by Landlord against any defects, and, upon notice of any defect during the Guaranty Period by Tenant, the Landlord shall have such defect or deficiency repaired, remedied or, if necessary, have the applicable Cooling Units replaced, at Landlord's cost; provided, however, if such defect is due to Tenant's or Tenant's contractors, agents or employees' actions or alterations, then Tenant, at its sole cost, shall be responsible for such repair or remedy.

9

> Landlord shall, at its sole cost and expense, enter into a regularly scheduled preventative maintenance and service contract for the Cooling Units during the Guaranty Period.

(Id. § 1.3(a).) As such, during the first year of the Lease, May 12, 2011 through May 12, 2012, the landlord had responsibility for inspection, maintenance, and repair of the Facility's HVAC systems (the "Guaranty Period"). *See also* Kearney Dep. 38:22-39:7; Garrett Dep. 127:16-23; Perkins Dep., 27:3-10; Parker Dep. 50:10-13, 50:25-51:4; Tursi Dep. 68:10-18. After the Guaranty Period, the responsibility for the Facility's HVAC systems shifted to the tenant, and the landlord had none. *See* Kearney Dep. 39:22-40:1; Perkins Dep. 27:11-14, 29:12-30:5, 30:15-21; Parker Dep. 54:8-12; Tursi Dep. 46:24-47:2, 48:3-11, 68:10-18.

During Columbia's ownership of the Facility from February 2, 2006 to September 25, 2012, Lincoln Property Company ("Lincoln") – a full-service real estate company with a property management division – managed the Facility on Columbia's behalf. (Parker Dep. 19:1-10, 24:17-22, 25:18-25, 46:1-8, 19-22.) Lisa Perkins was the Lincoln property manager assigned to the Facility from October 2010 until the Facility was sold in September 2012. (Perkins Dep. 18:5-8, 19:7-16; Parker Tr. 30:8-10, 31:6-9.) Perkins' duties as property manager of the Facility were to maintain the common areas of the property (parking lot, snow removal, roof leaks), deal with tenant issues, and take care of the

10

financials. (Perkins Dep. 20:16-22.) Lincoln did not have any responsibility for repairs inside the Facility. (Parker Dep. 13:19-22.)

Perkins understood that maintenance and repair of the Facility's electrical panels were the responsibility of the tenant, and Mary Parker, Lincoln Vice President, understood that the tenant had sole responsibility over the electrical equipment at the Facility. (Parkins Dep. 50:20-51; 9, 52:5-10; Parker Dep. 14:21-15:3, 48:5-17, 50:14-24, 65:19-22.) While Perkins was the property manager for the Facility, she does not recall any electrical issues at the Facility, and she did not receive any complaints regarding the Facility's electrical system or circuits tripping. (Parkins Dep. 37:17-38:1, 51:21-52:4.) Nor did Perkins recall anyone on behalf of Lincoln, the landlord, or the tenant inspecting or servicing the Facility's electrical panels in any way. (Perkins Dep. 31:24-32:13.)

Through a series of corporate name changes and agreements, Univeg Logistics of America, Inc. ("Univeg") arguably became the tenant of the Facility under the Lease. (Sotomayor Aff.; Tursi Dep. 44:2-4.)[2] The Facility had been vacant for approximately 13 months prior to Univeg's tenancy. (Garrett Dep.

---

[2] In briefing the instant motions, HDI has taken the position that Univeg was not the tenant of the Facility; rather, the true tenant was a corporate affiliate. For purposes of the motions, the Court operates under the assumption that Univeg became the tenant of the Facility and a party to the Lease Agreement. This should not be considered a legal finding, as the issue has not been fully briefed or litigated, but arose in a series of reply briefs.

11

69:17-19, 70:9-14; Parker Dep. 35:14-16; Tursi Dep. 54:7-11, 55:4-8.) As a result, there was a transition period in which the Facility needed to be prepared for Univeg's tenancy so that Univeg was not fully operational in the Facility until early July 2011. (Garrett Dep. 64:6-9; Tursi Dep 48:19-49:17.)

During this transition period, which was still during the Guaranty Period of the Lease Agreement, the landlord hired a third-party HVAC company named Delcard to do an inspection of the HVAC equipment. (Parker Dep. 52:25-53:3; Tursi Dep. 51:10-17.) Later during the Guaranty Period, Columbia contacted Delcard to perform work to get the Facility's HVAC equipment up and running, such as replacing compressors, fixing leaks, fixing wiring issues, and defrosting heater and evaporator motors. (Perkins Dep. 28:16-25, 31:2-6, 62:11-14; Hartnett Dep. 22:9-23:2.) Univeg did not perform, or hire anyone to perform, an inspection of the HVAC or electrical systems prior to moving into the Facility. (Tursi Dep. 59:5-21, 54:3-6.)

On September 25, 2012, Cabot III – NJ2M01-M02, LLC ("Cabot") became the owner of the Facility and the landlord under the Lease. (Haggerty Cert Ex. J; Kayal Cert. Ex. C; Murphy Cert. Ex. D.) As a result of this acquisition and the associated agreements, the responsibilities over the HVAC and electrical systems remained the same as to the tenant and the landlord

under the Lease. (Haggerty Cert. Ex. P, R, S; Kayal Cert. Ex. C; Murphy Cert. Ex. E.)

Prior to acquiring the Facility, the parent company of Cabot hired a third-party consultant to inspect the Facility and prepare a Property Condition Assessment report, which is dated September 25, 2012 ("Assessment"). (Stuart Dep. 20:7-21:6; 82:14-83:4.) The Assessment did not report any problems with the Facility's heating, ventilation, and/or air conditioning systems. (Haggerty Cert. Ex. A.) Nor did the Assessment report any problems with the Facility's electrical systems, stating: "No problems with the electrical systems were reported." (*Id.*) The Assessment included a recommendation, however, that "infrared electrical distribution scans" be conducted "as part of routine maintenance" of the electrical panel. (*Id.*)

Around the time Cabot acquired the Facility, Cabot and Flynn entered into a Property Management Agreement ("Management Agreement") with an effective date of September 25, 2012 in which Flynn agreed to manage the Facility. (Haggerty Cert. Ex. T; Murphy Cert. Ex. H.) Section 4.8 of the Management Agreement provides that Flynn "shall perform or cause to be performed any and all duties, services, or other obligations of [Cabot] to all tenants of space within the Property, as set forth in the leases relating to the Property." The Management Agreement further required Flynn to: "immediately ascertain the general

13

condition of the Property," §4.2(a); "familiarize itself with the layout, construction, location, character, plan and operation of the lighting, heating, plumbing and ventilation systems, as well as elevators, if any, and other mechanical equipment and systems of the Property," § 4.2(b); "conduct regular and systematic inspections of the buildings, grounds, utilities, and parking areas of the Property" and "be responsible for all tenant relations and . . . enforce all rules, regulations, or notices which may be promulgated by Owner or Manager; notify Owner promptly of any substantial defects in the Property of which Manager is aware; and notify Owner of any fire or other significant damage to the Property," §4.8(b)-(c); and "continuously operate the Property as a high quality property, and shall, consistent with the Operating Plan, perform or cause to be performed all tasks deemed necessary or appropriate in its discretion for the efficient operation of the Property," §4.8(a). (*Id.*)

Mike Kelly, the Flynn property manager assigned to the Facility, conducted weekly inspections of the Facility to observe visual conditions (mostly exterior), which included visual inspection of the exterior pad-mounted transformers (but not the electrical panels), and visible damage or slippery conditions during the winter. (Kelly Dep. 35:25-36:7, 36:19-37:1, 37:19-38:7, 58:16-19.) Kelly understood that everything outside the walls of the Facility was the responsibility of Cabot and everything inside the premises to be the tenant's responsibility.

14

(Kelly Dep. 106:14-22, 107:5-12.) Kelly testified that neither Flynn nor Cabot conducted an inspection of the electrical panels in the Facility during the six months before the fire, nor did they hire someone to do so. (Kelly Dep. 51:22-25, 52:12-19.)

Univeg hired Malco Electric LLC ("Malco"), a residential, commercial, and industrial contractor, to do electrical work at the Facility when Univeg was preparing the Facility to become operational in June 2011. (LaMarra Dep. 12:17-19, 31:10-23.) Malco continued to provide services for Univeg at the Facility after Univeg moved in. (LaMarra Dep. 45:8-13, 46:9-15, 47:8-13, 48:6-21.) The only electrician hired to do work at the Facility between June 2011 and the day of the fire was Malco, and no requests for service to Malco came from Cabot or Flynn. (LaMarra Dep. 64:8-13; DiGiorgio Dep. 70:8-11.)

On May 18, 2012, Univeg entered into an HVAC Preventative Maintenance Agreement ("HVAC Maintenance Agreement") with Worth[3] for maintenance, service, and repair of the refrigeration equipment (or "HVAC" equipment) at the Facility. (Haggerty Cert. Ex. BB.) The HVAC Maintenance Agreement remained in effect when the fire occurred. From the time Univeg

---

[3] On December 3, 2011, Worth acquired Delcard in some form because Delcard was going out of business, and as a result, Worth assumed some of Delcard's projects and warranty issues, including the relationship at the Facility. (Garrett Dep. 134:20-24; Wright Dep. 34:6-12; Krupa Dep. 16:19-23; Simon Dep. 60:9-11, 61:12-25; DiMezza Dep. 24:6-22.)

moved into the facility until the day of the fire, Delcard and Worth were the only companies who performed HVAC work at the Facility. (DiGiorgio Dep. 5:8-21, 106:1-6.)

Columbia New Jersey Commodore Industrial, LLC [motion 155]

Columbia seeks summary judgment on Worth's claim for contribution because it owed no duty to Plaintiffs and did not breach any duty. Columbia had an industrial lease agreement with DeWeide Blick that was later assumed by Univeg. Under that unambiguous agreement, the tenant was responsible for maintaining all interior equipment at the Facility, including the electrical panel.

Further, Columbia did not own the Facility at the time of the fire. Generally, a seller of property is not subject to liability for an injured third person once the buyer has taken possession. See Cogliati v. Ecco High Frequency Corp., 456 A.2d 524, 527-28 (1983) (reasoning that since the seller has no authority to rectify a condition on property not belonging to him, his duty had terminated).

Worth's expert opines that the fire started as the result of a failure inside the electrical panel caused by the weakening of mounting hardware and insulating material due to loose connections. Worth therefore argues that Columbia did not maintain the electrical panel for the six years it owned the Facility, and did not take any steps to ascertain whether Univeg was maintaining the panel.

There is no evidence that Columbia had any knowledge of any problem with the electrical panel prior to the sale of the Facility to Cabot, which was six months prior to the fire. The HVAC and electrical systems were inspected prior to the sale and found to be in working order, although providing infrared electrical distribution scans as part of routine maintenance was recommended under Electrical "Conditions/Recommendations." <u>See</u> Haggerty Cert. Ex. A, Kayal Cert. Ex. I, Murphy Cert. Ex. J, Sept. 25, 2012 Property Condition Assessment. This type of recommendation contained in a pre-acquisition due diligence report does not eviscerate the contract between landlord and tenant and does not create a duty on Columbia's part. Under the terms of the lease agreement, considering the conduct of the parties, and in light of the assignment of rights and assumption of liabilities from Columbia to Cabot, there is no basis to hold Columbia liable for the fire six months after it sold the Facility. Summary judgment on the Third-Party Complaint will be granted in favor of Columbia.[4]

---

[4] Columbia also seeks summary judgment on its crossclaim for indemnification by Univeg pursuant to Section 12.1 of the Lease Agreement between Columbia and Univeg and for insurance coverage by Univeg pursuant to Section 12.3.1. Univeg opposes this part of the motion, noting that the September 25, 2012 Assignment and Assumption of Leases between Columbia and Cabot assigned all of Columbia's rights and interests in the Leases, precluding Columbia's claim for indemnification and first party coverage insurance. The Court agrees.

17

Cabot III-NJM01-M02, LLC [motion 157]

Cabot seeks summary judgment on Worth's claim for contribution because under the triple-net lease, the tenant exclusively operated the warehouse premises and the owner/landlord therefore owed no duty to Plaintiffs. In New Jersey, where a commercial tenant is responsible for maintaining the premises and for paying utilities, taxes, and other property expenses, the courts look to the provisions of the lease to determine which party had the legal duty to maintain the portion of the premises on which the injury occurred. Geringer v. Hartz Mountain Dev. Corp., 908 A.2d 837, 842 n.2 & 843 (N.J. Super. Ct. App. Div. 2006). The Lease states that Tenant "shall, at its own cost and expense, keep and maintain all parts of the Premises (except those listed as Landlord's responsibility in Paragraph 5.1 above) in good and sanitary condition." The Lease states that the Landlord's (*i.e.*, Cabot's) responsibilities, enumerated in Paragraph 5.1, are limited to "only" the roof, foundation, exterior walls, and common areas. The Court finds the applicable Lease Agreement unambiguously places responsibility for maintenance and repair of the electrical panel and HVAC units on the tenant. Because Cabot was not responsible for the internal electrical system of the Facility (as well as the HVAC system) under the Lease, the Tenant was responsible for such systems. Actual practice of the parties supports this theory. Univeg utilized its own employees, outside retained electricians, and outside/contracted HVAC contractors to handle

18

any operational or building issues. Further, Cabot was not aware of any alleged issues with the electrical system and there is no evidence in the record of any defect or problem with the circuit breaker panel box.

Worth argues that because Cabot retained responsibility for maintaining portions of the premises, this case is distinguishable from Geringer, and the Lease language here may be read as ambiguous causing an issue of material fact to preclude summary judgment.

Although Cabot originally moved for summary judgment on the crossclaims for contractual indemnification, defense, and insurance coverage, it has since withdrawn that portion of the motion. [Docket Entry 172.]

The Flynn Company [motion 139]

Flynn seeks summary judgment on Worth's Third-Party Complaint based on lack of duty because Flynn had been the property manager only for common area maintenance, contract administration, and rent collection at the warehouse. The Court finds that neither the Lease nor the Property Management Agreement imposed a legal duty on Flynn to maintain, inspect, or repair the Facility's electrical and/or HVAC systems or otherwise created a duty on Flynn's part to Plaintiffs. For the same reasons discussed with regard to Cabot, its property manager Flynn will be granted summary judgment.

Flynn also seeks dismissal of Third-Party Defendant Columbia New Jersey Commodore Industrial, LLC's crossclaims for negligence/contribution for lack of duty, as outlined, above and for breach of contract for insurance coverage because no contract existed between Columbia and Flynn. Rather, Columbia sold the Facility prior to Flynn becoming its property manager. Columbia did not oppose this motion. Flynn seeks summary judgment on the claims for indemnification because it did not contractually agree to indemnify either Worth or Columbia, see Kieffer v. Best Buy, 14 A.3d 737, 742-43 (N.J. 2011), and did not have a "special relationship" under New Jersey law to trigger a common law indemnification obligation, see Katz v. Holzberg, 2013 WL 5946502, at *3 (D.N.J. Nov. 4, 2013). This aspect of the motion is unopposed. Flynn has agreed to withdraw without prejudice its motion as to Cabot III-NJ2M01-M02's first crossclaim for contribution.

## Conclusion

For these reasons, as well as those articulated during oral argument, the Court finds that the moving parties owed no duty to Plaintiffs that could possibly give rise to the contribution sought in the Third-Party Complaint. The three motions for summary judgment will be granted.

An appropriate Order will be issued.

Dated: March 20, 2017                    /s/ Joseph H. Rodriguez
                                          JOSEPH H. RODRIGUEZ, U.S.D.J.